Filed 1/18/22  Winick v. Noble LA Events CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| STEPHEN WINICK, | B305697 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC569126) |
| v. | |
| NOBLE LA EVENTS, INC. et al., | |
| Defendants and Respondents; | |
| PROSIGHT SPECIALTY INSURANCE, | |
| Intervener and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patricia D. Nieto, Judge.  Affirmed.

Samuel O. Ogbogu for Plaintiff and Appellant.

Bordin Semmer, Joshua Bordin-Wosk, Bryan Aghakhani, and Christopher Blanchard for Defendant and Respondent Dick Clark Productions, Inc.

Lieber & Galperin, Yury Galperin, and Jason A. Lieber for Defendant and Respondent Thomas Applewhite.

Nelson Griffin, Frederic T. Tanner, and Steven A. Garcia for Defendants and Respondents John McKillop and Noble Associates Worldwide Inc., and Intervener and Respondent Prosight Specialty Insurance.

_____

**INTRODUCTION**

Dick Clark Productions, Inc. produced the 2014 Golden Globe Awards show, an annual ceremony recognizing achievements in film and television. Stephen Winick occasionally photographed celebrities and sold his pictures. By 2014 Winick had attempted to "crash" (i.e., attend without permission) multiple events where celebrities were present, including at least one prior Golden Globes Awards show. (See *Winick v. Hilton Management, LLC* (Oct. 29, 2018, B280774) [nonpub. opn.].)

Dick Clark Productions hired a private security company, Noble LA Events, Inc., to provide security for the 2014 Golden Globes Awards show. Familiar with Winick and his reputation, Noble LA put Winick on its "No-Fly" list of individuals Noble LA generally did not permit at events it provided security for.

The 2014 Golden Globes Awards show was at a hotel in Beverly Hills. Even though his name was on the No-Fly list, Winick managed to obtain a credential that allowed him to enter the press room where members of the media viewed the ceremony. On learning Winick was in the press room, two Noble LA security guards approached Winick, physically removed him from the room, and took him to another room in the hotel

Noble LA used as its command post. The security guards detained Winick there until law enforcement arrived. The entire incident lasted 45 minutes. After complaining to the police, Winick left the event.

Winick sued Dick Clark Productions, Noble LA, and several other entities and individuals involved in the incident, asserting various causes of action, including for false imprisonment, assault, and battery. Following a court trial, the court entered judgment in favor of all the defendants. Among other things, the court ruled the actions of the security guards were reasonable under the circumstances. Winick appealed from the judgment. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *Winick Files a Lawsuit*

Winick filed this action in January 2015 against Dick Clark Productions; Noble LA Events Inc.; John McKillop, who owned and operated Noble LA at the time; and Thomas Applewhite, who worked for an independent contractor Noble LA hired to assist with security for the event and who was one of the security guards involved in the incident. In his operative third amended complaint, Winick asserted causes of action for false imprisonment, assault, battery, negligence, and violation of the Bane Civil Rights Act (Civ. Code, § 52.1) (Bane Act).

Dick Clark Productions, Noble LA, and McKillop demurred to the third amended complaint. Noble LA and McKillop argued Winick did not state sufficient facts to support any cause of action; Dick Clark Productions did not challenge the false imprisonment, battery, or assault causes of action, but argued

3

Winick did not allege facts sufficient to state causes of action for negligence or for violation of the Bane Act. The trial court overruled the demurrers to the false imprisonment, assault, battery, and negligence causes of action, but sustained without leave to amend the demurrers to the cause of action for violation of the Bane Act.[1] Winick later added Noble Associates Worldwide, Inc., another entity owned by McKillop that had an ownership interest in Noble LA, as a defendant.[2]

B.    *The Court Excludes Winick's Trial Exhibits and Conducts a Court Trial*

Winick never posted jury fees. During a status conference in August 2018—more than three years after Winick filed his complaint—the trial court set the final status conference for February 2019 and the trial for March 2019. In February 2019, in advance of the final status conference, Noble LA, Dick Clark

---

[1]    The trial court also dismissed Winick's causes of action for respondeat superior, negligent selection of contractor, and intentional infliction of emotional distress. Winick does not challenge the rulings dismissing these causes of action.

[2]    We refer to Noble LA Events Inc., Noble Associates Worldwide, and McKillop collectively as Noble LA. At some point the Secretary of State suspended Noble LA Event's corporate status. Before trial, Noble LA Event's insurer, Prosight Specialty Insurance, filed a motion for leave to file a complaint in intervention on behalf of Noble LA Events under Code of Civil Procedure section 387, which the trial court granted.

Productions, and Applewhite filed proposed witness and exhibit lists. Winick did not.

The court, at Winick's request, continued the trial date several times and eventually reset the final status conference for August 15, 2019, and the trial for August 27, 2019. Shortly before the continued final status conference, Dick Clark Productions filed a motion to continue the trial on the ground counsel for Winick had failed to cooperate with counsel for the defendants on various issues. Counsel for the defendants claimed counsel for Winick had refused to meet and confer to prepare joint trial documents and had failed to make Winick or Winick's expert available for deposition. The trial court denied the request to continue the trial, imposed monetary sanctions against Winick for failing to meet and confer with the defendants, and precluded Winick from calling any witnesses or introducing any exhibits that were not on the defendants' witness and exhibit lists.

On August 27, 2019 the trial court observed that Winick had not posted jury fees. Counsel for Winick offered to post jury fees that day, but Noble LA and Dick Clark Productions (both of which had previously posted jury fees) waived their right to a jury trial and requested a court trial. The court ordered the trial to proceed as a court trial, stating it was "way too late" for Winick to post fees. On August 29, 2019 counsel for Winick orally asked the court to grant him relief from his jury trial waiver. The court again denied the request, stating that Winick had already delayed the trial enough by failing to adequately prepare for trial and that setting the case for a jury trial would cause further delay.

C.    *The Parties Present Different Versions of What Happened at the Awards Show*

1.    *Noble LA Knew Winick Would Try To Crash the Golden Globes Awards Show*

McKillop testified Dick Clark Productions hired Noble LA to provide security for the 2014 Golden Globes Awards show. Under the agreement, Noble LA's authority included "apprehending, detaining, investigating [and] ejecting an unauthorized person at the event."

McKillop knew about Winick before the awards show because, according to McKillop, Winick repeatedly tried to attend celebrity events without authorization. McKillop first encountered Winick at the 2011 Grammy Awards ceremony, where Winick was present without a credential, pass, or ticket. At the 2012 Golden Globes Awards show, Winick "crashed the ballroom" and was caught and arrested.[3] At the 2013 Golden Globes Awards show, McKillop spotted Winick on the property of the hotel that hosted the event (the same hotel that hosted the 2014 ceremony), and Winick ran away. McKillop said he

---

[3]    The People charged Winick with one count of criminal trespass under Penal Code section 602. The superior court ultimately found Winick factually innocent under Penal Code section 851.8 because, although Winick entered the event without a ticket or pass (see *Winick v. Hilton Management, LLC, supra*, B280774), there was no evidence Winick refused to leave the event after a person in lawful possession asked him to. (See Pen. Code, § 602, subd. (o).) We will discuss the difference between criminal and civil trespass later in this opinion. Undesignated statutory references are to the Penal Code.

discusses the fact that "Winick is a crasher" with his clients "all the time," including with his primary contact person at Dick Clark Productions. As McKillop put it, Winick is "discussed [for] every Golden Globes. It's an ongoing discussion."

Noble LA maintained a "No-Fly" list of people who had threatened security personnel or failed to comply with the rules and regulations of prior events and whom Noble LA generally would not allow at future events. Winnick was on the list. To enter the Golden Globes Awards show, invited guests had to obtain a credential, which was issued by a third party, not Noble LA. McKillop testified that he gave the No-Fly list to the company that issued the credentials, but that the entity mistakenly issued Winick a credential for the event. Under Noble LA's security agreement with Dick Clark Productions, however, McKillop had the authority to void credentials. Michael Izquierdo, another security guard employed by Noble LA who worked at the 2014 Golden Globes Awards show, similarly testified Dick Clark Productions gave Noble LA the authority to revoke someone's credential if he or she did not follow event rules.

2.  *Noble LA Presents Its Version of the Incident*

Izquierdo testified that on the day of the Golden Globes Awards show he instructed security personnel to look for people on the No-Fly list. Applewhite testified that during the event he received a radio call reporting that Winick was in the press room without authorization. Applewhite, who had seen Winick's name and photograph on the No-Fly list, approached Winick, who was seated in a row of chairs, and noticed Winick was not displaying a credential. Applewhite asked Winick four or five times to show

7

his credential, but Winick ignored him. Applewhite then asked Winick to follow him out of the press room so he could verify Winick's credential. Applewhite stated that eventually he touched Winick's elbow and "guided him out of the aisle" and that Winick did not offer much resistance. Once they cleared the aisle, a second guard, Robert Dixon, helped "escort" Winick out of the room.

Applewhite and Dixon took Winick to Noble LA's command post and left him with other Noble LA security guards. According to Applewhite, after they left the press room Winick became irate and began shouting profanities.

Izquierdo testified he interacted with Winick in the command post. The door to the command post was closed, and other security guards were present. Izquierdo questioned Winick to find out how he had been able to enter the event and where his credential was, but Winick refused to answer. At one point, according to Izquierdo, Winick placed his hands down his pants. Izquierdo asked Winick to show his hands, but Winick refused. Believing Winick might have a weapon, Izquierdo pulled Winick's hands "out of his pants," at which point a credential "fell to the floor," and Izquierdo took it. Eventually Izquierdo directed someone to call the Beverly Hills Police Department.

### 3. *Winick Presents His Version of the Incident*

Winick testified that he owns an ice cream store, but that he also photographs celebrities and sells the photographs. According to Winick, an entity called "AOL Movie Fan," which he did not know, contacted him and said that if he wanted to cover the 2013 Golden Globes Awards show, he should "go here and get a pass." In exchange for the pass, Winick agreed to take

photographs for AOL Movie Fan.[4]  Winick said he did the same thing for the 2014 Golden Globes Awards show, obtained a credential for the ceremony, and used it to enter the hotel and press room.

Winick's version of his removal from the awards show was generally similar to Noble LA's version, but the details differed. According to Winick, he was seated in the press room displaying his credential.  Applewhite and Dixon came up to him without saying anything; lifted him out of his chair by his leg, buttocks, shoulder, and neck; and carried him out of the press room.  Sam Rubin, an entertainment reporter who was in the press room at the time, testified that he heard a "commotion" and that "the room turned."  Rubin said that Applewhite and Dixon lifted Winick "not in a gentle manner" and that it was not a "friendly removal."

Winick testified Applewhite and Dixon dragged him to the command post, while Winick yelled, "Help, help."  Winnick stated that, although the security guards were holding his arms, he was able to tuck his credential into his shirt as they took him away. Winick said he did this because he feared the security guards would take his credential.

In the command post, a security guard pointed to a chair and told Winick to "sit down like a dog."  Winick was surrounded by several people.  Winick said:  "Get the police.  I want to leave." Izquierdo searched Winick, found the credential, and took it.

---

[4]     After the incident, McKillop investigated and "found no information to support" that AOL Movie Fan was "a legitimate press company."  He said that, in his years providing security at celebrity events, he has never encountered anyone from that company.

McKillop came in and told Winick, "You're going to jail this time. Last time I cut you a break, but this time you're going to jail." Winick said to McKillop, "I'm not talking to you.  Get me the police.  I have nothing to say."[5]  At one point Winick tried to leave, but someone forced him to sit down again.  Eventually, a Beverly Hills Police Department officer arrived, took Winick's statement in a hallway of the hotel, and walked Winick off the property.

Winick testified he had black and blue marks from the force Applewhite used when he grabbed Winick and dragged him away.  Winick, however, did not take pictures of his injuries (even though he worked as a photographer), nor did he seek medical care.  Winick also testified that he suffered from anxiety and was unable to sleep after the incident, but that he again did not seek any medical treatment.  He stated he lost income from his photography business because he took fewer photographs after the incident.

### 4. *Experts Testify About the Security Guards' Actions*

Winick called Louis Palumbo, a licensed private investigator, to testify as an expert witness about private security practices.  Palumbo coordinated security at the Golden Globes Awards shows from 1998 to 2011 and provided security for other events involving celebrities and prominent individuals.  Palumbo testified that, according to industry standards, security guards should observe and report irregularities to property managers and police, but should not eject individuals from a property.  In

---

[5]     McKillop claims he never spoke with Winick that day.

10

his opinion, there was no justification "based on industry standard for the removal of Mr. Winick from where he was sitting in the press room." In Palumbo's opinion, Noble LA also violated industry standards by confining and searching Winick in the command post.

Noble LA called Joseph DeLadurantey, a consultant to security firms, as an expert to rebut Palumbo's testimony. DeLadurantey served for 27 years with the Los Angeles Police Department and was chief of police for the Torrance Police Department. DeLadurantey disagreed with Palumbo's opinion that private security guards were limited to observing and reporting. He testified that, because Applewhite believed Winick was a trespasser who had either broken the law or violated a policy or procedure of the event, and because Winick was in the press room where interaction between security and Winick could cause a disturbance, Applewhite acted appropriately in moving Winick to a place of safety, like the command post. DeLadurantey also testified a private security guard observing a trespass may either confine individuals or ask them to leave, before conducting a citizen's arrest. In DeLadurantey's opinion, the security guards' conduct complied with security industry standards.

D. *The Trial Court Rules Against Winick*

The trial court ruled against Winick on each of his causes of actions. Most relevant to this appeal, the trial court ruled the security guards acted reasonably and according to industry standards when they confined and questioned Winick. The trial court, in its statement of decision, found the security guards detained Winick for a reasonable amount of time and in a

11

reasonable manner.  The court ruled the actions of the security guards were reasonable because Winick was "a known crasher who posed a threat to the safety and integrity of the 2014 Golden Globes"; Winick failed to "cooperate[ ] and display[ ] his credentials to security"; and the security guards confined Winick no longer "than was reasonable to investigate [his] presence" at the ceremony.  The trial court also found the security guards made a permissible citizen's arrest because they "had a reasonable good faith belief that [Winick] was committing a public offense in their presence," namely, a trespass.  Winick timely appealed from the judgment.

## DISCUSSION

A.  *The Trial Court Did Not Abuse Its Discretion in Declining To Relieve Winick from His Jury Trial Waiver*

A party waives the right to a jury trial by failing to timely deposit the required jury fees.  (Code Civ. Proc., § 631, subds. (b) & (f).)  The fees are generally "due on or before the date scheduled for the initial case management conference in the action."  (*Id.*, § 631, subd. (c).)  The initial case management conference here was in July 2015.  Winick had still not deposited the required fees by August 2019.  Therefore, under Code of Civil Procedure section 631 he waived his right to a jury trial.

Nevertheless, the "court may, in its discretion upon just terms, allow a trial by jury although there may have been a waiver of a trial by jury."  (Code Civ. Proc., § 631, subd. (g).)  Winick argues the court should have granted him relief from his jury trial waiver because there was no showing that allowing

12

Winick to have a jury trial would have prejudiced the defendants. As this court explained in *Mackovska v. Viewcrest Road Properties LLC* (2019) 40 Cal.App.5th 1, the "trial court should grant a motion for relief of a jury waiver 'unless, and except, where granting such a motion would work serious hardship to the objecting party.' . . . [¶] . . . [T]he crucial question is whether the party opposing relief will suffer any prejudice if the court grants relief. [Citations.] . . . 'The mere fact that trial will be by jury is not prejudice per se.' [Citation.] Denying relief where the party opposing the motion for relief has not shown prejudice is an abuse of discretion." (*Id.* at p. 10; see *Johnson-Stovall v. Superior Court* (1993) 17 Cal.App.4th 808, 810 ["it is well established in cases involving failure to make a request or post fees that there must be prejudice to the party opposing jury trial"].)

The problem with Winick's argument is that Winick did not give the defendants an opportunity to show how a jury trial would prejudice them. Unlike the plaintiff in *Mackovska*, who filed a motion for relief from waiver several months before trial, Winick did not file a motion (or even an ex parte application on shortened notice) for the defendants to oppose and present evidence on the issue of prejudice. When the court pointed out on August 27, 2019, the day trial was scheduled to begin, that Winick had waived his right to a jury trial by not posting fees, counsel for Winick did not ask for relief from the jury trial waiver.[6] It was not until two days later—the day before Winick

---

[6] Counsel for Applewhite informed the court on August 29, 2019 that counsel for Winick had advised the defendants he intended to file an ex parte application to seek relief from the jury trial waiver, but that counsel for Winick had withdrawn his

13

was scheduled to call his first witness—that counsel for Winick orally asked the court for relief from the waiver. Because Winick never filed a motion for relief from the jury trial waiver, the defendants never had an opportunity to argue and submit evidence, and the trial court never had an opportunity to rule, on the issue of prejudice (or any other issue related to relief from the jury trial waiver).

The trial court, however, did find that granting Winick's oral request for relief from his jury trial waiver would prejudice the court. (Cf. *Johnson-Stovall v. Superior Court*, *supra*, 17 Cal.App.4th at p. 811 [a trial court abuses its discretion in denying relief from a jury trial waiver where """there has been no prejudice to the other party or to the court from an inadvertent waiver""""]; *Gann v. Williams Brothers Realty, Inc.* (1991) 231 Cal.App.3d 1698, 1704 [same].) As of the August 27, 2019 trial date, the defendants still had not completed Winick's deposition—in part because Winick had refused to answer certain questions—despite a court order requiring Winick to appear. As a result, the defendants asked the court to order Winick to appear for the completion of his deposition on August 27, 2019 (the trial date), and the court did not order a panel of prospective jurors for that date. Counsel for Winick even admitted he "thought that trial in any form was not going to go forward until [Winick's] deposition was completed." When counsel for Winick requested relief from the jury trial waiver, the trial court stated it could not allow any further delays in the trial because the court had two trials scheduled the following week. (See *Gann*, at

request. Counsel for Winick did not dispute counsel for Applewhite's statement.

14

p. 1704 ["[i]n exercising its discretion, the trial court may consider delay in rescheduling jury trial"]; *March v. Pettis* (1977) 66 Cal.App.3d 473, 480 [same].) And as the trial court observed, Winick bore much of the responsibility for the delay in bringing the case to trial: Winick had requested several trial continuances, failed to meet and confer with the defendants before the final status conference, and failed to make himself or Palumbo available for deposition. (See *Gann,* at p. 1704 [trial court may consider "any reasonable factors supporting denial of relief"].) Under the circumstances, the trial court did not abuse its discretion in denying Winick relief from his jury trial waiver.

B. *The Trial Court Did Not Err in Ruling Against Winick on His Causes of Action*

On review of a judgment entered after a court trial, "'we review the entire record in the light most favorable to the judgment to determine whether there are sufficient facts, contradicted or uncontradicted, to support the judgment.'" (*Patricia A. Murray Dental Corp. v. Dentsply Internat., Inc.* (2018) 19 Cal.App.5th 258, 270.) Where, as here, a "'"'statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.'"'" (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1027; see *Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 45-46.)

As discussed, the trial court ruled Winick could not prevail on his causes of action because the security guards' conduct was reasonable and because the guards were conducting a lawful citizen's arrest under a good faith belief Winnick was committing

15

a trespass.  Winick largely focuses on the portion of the court's ruling that the security guards were making a citizen's arrest. He contends "there is no good faith or reasonable belief defense for a private citizen or security guard" to conduct a private citizen's arrest under section 837.  Instead, Winick argues, "the crime of trespass must have been committed or attempted in the presence" of the security guards, and none of the Penal Code provisions governing criminal trespass applied.

Winick is correct that the security guards did not have the authority to conduct a citizen's arrest under section 837 because Winick did not commit a criminal trespass in their presence.  But because Winick was engaged in a civil trespass, the security guards (acting under the authority of Dick Clark Productions) had the right to use reasonably necessary force to remove Winick from the Golden Globes Awards show.  And there was substantial evidence the security guards' use of force, including the temporary confinement of Winick in the command post, was reasonably necessary to remove Winick.

1.  *The Security Guards Did Not Conduct a Lawful Citizen's Arrest*

Section 837 provides a "private person may arrest another" person for (1) a misdemeanor "committed or attempted in his presence"; (2) "[w]hen the person arrested has committed a felony, although not in his presence"; or (3) "[w]hen a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it."  (See *People v. Bloom* (2010) 185 Cal.App.4th 1496, 1501.)  As the California Supreme Court explained in *Cervantez v. J. C. Penney* Co. (1979) 24 Cal.3d 579, the "authority of a private citizen to make an arrest is more

16

limited than that of a peace officer." (*Id.* at p. 587; accord, *Hamburg v. Wal-Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 512.) "A peace officer may arrest a person without a warrant whenever he has probable cause to believe that the person has committed a misdemeanor in his presence. [Citation.] A private citizen, however, may arrest another for a misdemeanor only when the offense has actually been committed or attempted in his presence." (*Cervantez*, at p. 587; accord, *Hamburg*, at p. 512; see § 836, subd. (a)(1).) "The mere fact that the private person has reasonable cause to believe a misdemeanor offense has been committed or attempted in his presence is not enough." (*Hamburg*, at p. 512; see *People v. Aldapa* (1971) 17 Cal.App.3d 184, 188; *Tekle v. United States* (9th Cir. 2007) 511 F.3d 839, 854.)

Winick argues the security guards did not conduct a lawful arrest because none of the Penal Code provisions defining criminal trespass applied in this case. And he is correct. The Penal Code criminalizes several types of trespass. (See §§ 601, 602.) For example, unauthorized entry onto certain types of land or into certain types of buildings (see, e.g., § 602, subds. (g) [land where oysters or shellfish are planted or growing], (h) [land where cattle, goats, and other animals are raised], (l) [land under cultivation], (p) [land declared closed to entry as a hazardous fire area], (u) [airports, vessel terminals, and public transit facilities]), including residences (§ 602.5), is a misdemeanor. So too is entering land for the purpose of injuring property or interfering with a business. (§ 602, subd. (k).) But there is no provision that generally makes it a crime to enter private property without permission. Instead, for private property not otherwise covered by the statute, a person generally commits a

criminal trespass only after the owner, owner's agent, person in lawful possession, or a peace officer asks the person to "leave" the property and the person refuses or fails to do so. (See § 602, subd. (o).)

There was no evidence anyone asked Winick to leave the hotel property before Applewhite and Dixon physically removed him from the press room and confined him in the command post. Applewhite came close; he asked Winick to accompany him out of the press room so that Applewhite could verify Winick's credential. But he did not actually ask Winnick to leave the hotel. Therefore, the trial court erred in ruling the security guards conducted a lawful citizen's arrest merely because they had probable cause to believe Winick committed a trespass. And there was no evidence Winick in fact committed a criminal trespass in the presence of the security guards.

2.  *The Trial Court Did Not Err in Ruling the Security Guards Used Reasonably Necessary Force To Protect from Winick's Trespass*

Dick Clark Productions argues that, aside from section 837, "[p]rivate actors may detain individuals when there is probable cause to believe an injury to property is about to occur, and are thus privileged against a false imprisonment claim." Dick Clark Productions similarly argues that "[f]orce necessary to protect from wrongful injury to person or property is privileged against assault or battery claims," including to protect from a trespass. Dick Clark Productions is, more or less, correct on these points.

a. *Applicable Law*

"Any necessary force may be used to protect from wrongful injury the person or property of oneself . . . ." (Civ. Code, § 50; see *MacLeod v. Fox West Coast Theatres Corp.* (1937) 10 Cal.2d 383, 388 ["'The timeworn rule of torts is that a person has a right to use all such force as is reasonably necessary to protect his person or property.'"].) This well-established rule of tort law extends to owners protecting their real property from trespassers. As the Supreme Court held in *MacLeod*, "an owner has the right to forcibly eject trespassers and if the force used is not excessive, the trespasser has no personal action against the owner. The correctness of [this proposition] has never been questioned and now stands as the accepted law of this jurisdiction.'" (*MacLeod*, at p. 389; see *Stowell v. Evans* (1931) 211 Cal. 565, 567 [owner of a game preserve could use "so much force only as was necessary to eject plaintiff from the premises"]; Rest.2d Torts, § 77 ["an actor is privileged to use reasonable force, not intended or likely to cause death or serious bodily harm, to . . . terminate another's intrusion upon the actor's land"].)

The use of necessary force to eject a trespasser can be a defense to causes of action for battery and assault (*Stowell v. Evans*, *supra*, 211 Cal. at p. 567) and false imprisonment (*McCarty v. Fremont* (1863) 23 Cal. 197, 198). (See Rest.2d Torts, § 80 [to prevent a trespass, the "actor is privileged intentionally to confine another or to put him in apprehension of a harmful or offensive contact"]; see, e.g., *MacLeod v. Fox West Coast Theatres Corp.*, *supra*, 10 Cal.2d at p. 388 ["it affirmatively appears that in ejecting plaintiff from the theatre neither excessive force, nor more force than reasonably was necessary was exerted, it follows that plaintiff had no cause of action against the defendants"].)

19

Like other defenses under Civil Code section 50, the use of necessary force to remove a trespasser is an affirmative defense, which the defendant has the burden to prove.  (See *Carlson v. Wald* (1984) 151 Cal.App.3d 598, 601; *Boyer v. Waples* (1962) 206 Cal.App.2d 725, 727.)

> b.  *Substantial Evidence Supported the Trial Court's Finding Winick Committed a Trespass*

Although Winick may not have committed a criminal trespass, there was substantial evidence he committed a civil trespass.  The law governing civil trespass is broader than the provisions of the Penal Code governing a criminal trespass.  A civil trespass includes any "'"invasion of the interest in the exclusive possession of land, as by entry upon it . . . ."'"  (*Kapner v. Meadowlark Ranch Assn.* (2004) 116 Cal.App.4th 1182, 1189.) "'The essence of the cause of action for trespass is an "unauthorized entry" onto the land of another.'"  (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1042; see *Huntingdon Life Sciences, Inv. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1264.)

There was substantial evidence Winick entered the Golden Globes Awards show without authorization.  Dick Clark Productions, the producer of the Golden Globes Awards show, and Noble LA, which it hired to provide security, did not want Winick at the event.  Winick tried to attend at least one prior Golden Globes Awards show without authorization, McKillop had discussed Winick with Dick Clark Productions, and Dick Clark Productions knew Winick was on Noble LA's No-Fly list of people

20

who were not permitted.  True, Winick may have managed to obtain a credential that enabled him to initially bypass security and enter the event.  But McKillop testified he sent the No-Fly list to the entity that issued the credential, and the entity issued the credential by mistake.  And in any event, McKillop and Izquierdo testified Noble LA had the authority to void a credential.  (See *Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1780 ["'A good faith belief that entry has been authorized or permitted provides no excuse for infringement of property rights if consent was not in fact given by the property owner whose rights are at issue.'"]; *Miller v. National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1480 [same].)

In addition, Applewhite testified Winick was not displaying his credential when Applewhite approached him.  And when Applewhite asked for his credential, Winick refused to show it or explain why he did not have it displayed.  Izquierdo testified all guests at the Golden Globes Awards show were required to display their credentials; because Winick's refusal to comply violated the rules, he lost any prior authorization he may have had to attend at the event.  (See *Cassinos v. Union Oil Co.*, *supra*, 14 Cal.App.4th at p. 1780 ["Where one has permission to use land for a particular purpose and proceeds to abuse the privilege . . . he becomes a trespasser."]; *McChristian v. Popkin* (1946) 75 Cal.App.2d 249, 260 [theater proprietor could "adopt and enforce reasonable and proper regulations, using if necessary reasonable force to evict a patron who refuses to leave and persists in violating proper and reasonable regulations"].)

> c. *Substantial Evidence Supported the Trial Court's Finding the Security Guards Acted Reasonably in Detaining Winick*

Because Winick was interfering with Dick Clark Productions' possessory interest in the event space, Dick Clark Productions could use reasonable force to eject Winick. (See *Spinks v. Equity Residential Briarwood Apartments*, *supra*, 171 Cal.App.4th at p. 1042 [trespass law "'affords protection for a possessory, not necessarily an ownership interest'"]; *Staples v. Hoefke* (1987) 189 Cal.App.3d 1397, 1406 [lessee may maintain action for trespass].) And, as Winick testified, Dick Clark Productions delegated to Noble LA the authority to eject unauthorized persons. (See *Tomblinson v. Nobile* (1951) 103 Cal.App.2d 266, 270 [private detective hired by a restaurant proprietor "had the right to eject trespassers from the premises" of the restaurant, "if the circumstances warranted such action"]; Rest.2d Torts, § 86 [an actor is privileged to use reasonable force "for the purpose of . . . terminating the other's intrusion upon a third person's possession of land" if "the third person is, . . . a person whose possession the actor is under a legal duty to protect"].)[7] The only issue is whether the security guards' use of force was reasonable.

"[T]he question of the amount of force justifiable under the circumstances of a particular case is . . . one for the trier of fact." (*Haeussler v. De Loretto* (1952) 109 Cal.App.2d 363, 364; see *Fawkes v. Reynolds* (1922) 190 Cal. 204, 212-213 ["The question of the amount of force justified in . . . maintaining the possession

---

[7] Winick does not argue Dick Clark Productions could not delegate its authority to eject trespassers.

of property is one peculiarly within the province of the jury."].) Here, substantial evidence supported the trial court's finding Applewhite and Dixon used reasonable force to remove Winick from the press room. Applewhite testified that he asked Winick multiple times to follow him out of the press room so he could verify Winick's credential and that Winick ignored all of his requests. At that point, some physical force was reasonably necessary to remove Winick.

Applewhite also testified he and Dixon used only minimal force to remove Winick. Applewhite stated he guided Winick out of his seat by placing his hand underneath Winick's arms and then escorted him through the hotel with his hand on the back of Winick's elbow. Winick gave a different version of the encounter, but the trial court did not have to find Winick's version credible. (See *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 ["Venerable precedent holds that, in a bench trial, the trial court is the 'sole judge' of witness credibility."].) And there was good reason not to. The trial court found Winick undermined his credibility by asserting in his verified discovery responses he received medical treatment for his injuries, but admitting at trial he did not. The trial court also found Winick did not plausibly explain how he purportedly hid his credential after Applewhite and Dixon detained him, or why he did so. (See *ibid.* ["The trial judge may believe or disbelieve [even] uncontradicted witnesses if there is any rational ground for doing so."].)[8]

---

[8] Rubin, who stated Applewhite and Dixon removed Winick in an unfriendly way, did not state they lifted Winick or dragged him out of the press room in the manner Winick described.

DeLadurantey's testimony also supported the reasonableness of Applewhite's and Dixon's actions. According to DeLadurantey, Applewhite and Dixon needed to physically take Winick to a place of safety to avoid disrupting an event like the Golden Globes Awards show, where many people were present.

Whether substantial evidence supported the trial court's finding that it was reasonable for Noble LA to confine Winick in the command post after Applewhite and Dixon removed him from the press room is a much closer question. Confining a trespasser as a means of ejecting the trespasser from the property can be unreasonable, particularly where the owner has not asked the trespasser to leave. (See 5 Witkin, Summary of Cal. Law (2021 supp.) Torts, § 491 ["The landowner usually should first warn or request the trespasser to leave."]; cf. *Boyajian v. Balian* (1935) 7 Cal.App.2d 174, 176 [defendants used excessive force to remove the plaintiffs from their apartment where the "plaintiffs, on being requested to leave, proceeded to do so and were beaten while in the act of leaving"].)[9] But Winick has not cited any authority that temporarily confining a civil trespasser to eject the trespasser is always unreasonable. (See Rest.2d Torts, § 80, com. a [recognizing that, while it may be "seldom that the actor finds it necessary to impose a confinement upon another to protect against" a trespass, the situation may arise]; see also *People v. Chen* (2020) 50 Cal.App.5th 952, 959 [citing the

---

[9] Which comports with criminal law. Had the security guards asked Winick to leave the hotel property after Applewhite and Dixon escorted him from the ballroom, and Winick refused, Winick would have committed a criminal trespass under section 602, subdivision (o).

Restatement Second of Torts, section 80].)  Under the circumstances here, viewing the evidence in the light most favorable to the judgment, the trial court did not err in finding the actions of the security guards in temporarily confining Winick were reasonable.

First, this case did not involve a one-time trespass, or at least not a one-time trespasser.  And Winick was no ordinary trespasser.  Noble LA knew Winick had repeatedly tried to access celebrity events without authorization, including the 2011 Grammy Awards show and the 2012 Golden Globes Awards show.  McKillop saw Winick at the 2013 Golden Globes Awards show, and Winick ran from him.  Despite these and other incidents, Winick returned to the Golden Globes Awards show where he knew (or at least should have known) he was not welcome.

Second, Winick had already demonstrated at the 2014 Golden Globes Awards show that he would not comply with the instructions of the security guards.  While Applewhite did not specifically ask Winick to leave the hotel, he did ask Winick multiple times to accompany him so that Applewhite could check his credential (a reasonable request), and Winick ignored him.  It was reasonable for the Noble LA security guards to believe that instructing Winick to leave, or even taking him to the exit, would have been futile and that Winick would have ignored their instructions and tried to reenter the property, as he had year after year.  (See *Phelps v. Arnold* (1931) 112 Cal.App. 518, 524 [where a landowner ordered a trespasser "to remain away from the premises[,] it was not a requirement that upon re-entry [the trespasser] should again be ordered to leave" before the landowner could use reasonable force to eject her]; Rest.2d Torts,

25

§ 77, com. l ["If the actor reasonably believes that the intruder knows that he is intruding and will persist in his intrusion despite a request to desist, the actor is not required to make the futile gesture of making a request which he has every reason to believe will be useless."].)

Third, when the Noble LA security guards initially took Winick to the command post, they did not know how Winick had gained entry to the event. DeLadurantey testified that, because Winick was on the No-Fly list, the guards had a responsibility to determine how Winick entered. It was reasonable for the guards to believe temporarily confining Winick to investigate how he had entered the event and determine whether he had a legitimate credential was necessary to prevent him from reentering, particularly given his history of attending ceremonies without authorization.

Fourth, the Noble LA security guards had reasonable grounds to believe Winick posed a safety threat—or at least a threat to disrupt the ceremony—if they did not confine him. It was undisputed Winick did not want to leave. And by the time Applewhite and Dixon escorted Winick to the command room, Winick was shouting profanities in the presence of other attendees and "creating a disturbance." DeLadurantey testified security guards have a responsibility to prevent disruptions, which may require temporarily detaining someone to deescalate a situation.

Finally, there was conflicting evidence about how much force the security guards used to confine Winick. On the one hand, it was undisputed that Applewhite and Dixon physically took Winick to the command post, that the door to the command post was closed (but not necessarily locked), and that several

26

security guards stood around Winick in the command post. (See *Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 715 [for false imprisonment, "[r]estraint may be effectuated by means of physical force . . . [or] confinement by physical barriers," and need only be """"for an appreciable length of time, however short""""].) On the other hand, Izquierdo testified that Winick never told the guards he was willing to leave the property voluntarily, that none of the guards threatened Winick or told him he could not leave, and that the security guards would not have physically restrained Winick if he tried to leave. And Winick admitted that, rather than cooperate, he "repeated [his] demand for the police at all times" while in the command post. Therefore, while the guards used some force in moving Winick from the press room to the command post, it was unclear how much force they used to keep him there and whether Winick had an opportunity to leave.

Nor was Winick's confinement unnecessarily long. The evidence showed that it was 45 minutes from the time Applewhite and Dixon approached Winick in the press room to the time the police arrived and spoke to Winick. And that length of time was partially the result of Winick's failure to cooperate with the security guards and produce his credential.[10]

---

[10] Because Winick's negligence cause of action was based on the same conduct as his intentional tort causes of action, Winick has not shown the trial court erred in ruling against him on his negligence cause of action. In addition, Winick does not challenge the trial court's ruling Izquierdo was justified in searching Winick after the security guards detained him in the command post.

C. *Any Error in Precluding Winick from Calling Additional Witnesses or Introducing Additional Exhibits Was Harmless*

Winick argues the trial court abused its discretion in ruling Winick could only call witnesses and introduce exhibits that were on the defendants' witness and exhibit lists. Any error in the court's ruling, however, was harmless.

Los Angeles County Superior Court Local Rules, rule 3.25(f)(1) provides: "At least five days prior to the final status conference, counsel must serve and file lists of pre-marked exhibits to be used at trial . . . , jury instruction requests, [and] trial witness lists . . . . Failure to exchange and file these items may result in not being able to call witnesses, present exhibits at trial, or have a jury trial."

Winick does not dispute he violated this rule—first in February 2019 and again in August 2019. Still, the trial court's decision to preclude Winick from calling any witnesses or introducing exhibits not on the defendants' lists is troubling. As the Supreme Court explained in *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, "[a]lthough authorized to impose sanctions for violation of local rules [citation], courts ordinarily should avoid treating a curable violation of local procedural rules as the basis for crippling a litigant's ability to present his or her case." (*Id.* at p. 1364.) Instead, any sanction should be proportionate and consistent "with the policy favoring determination of cases on their merits." (*Ibid.*) Here, although Winick initially failed to file the required witness and exhibit lists, he did submit proposed lists shortly after the final status conference. (See *id.* at pp. 1363-1364 ["trial court abused its discretion in sanctioning petitioner by excluding the bulk of his evidence simply because

he failed, prior to trial, to file a declaration establishing the admissibility of his trial evidence"]; *In re Harley C.* (2019) 37 Cal.App.5th 494, 508 [denying a party "the ability to call or examine any witnesses and to testify" at a hearing because "counsel had not filed a joint trial statement . . . was neither fair nor accessible justice"].) And the usual remedy for violating this kind of local rule is to order counsel to immediately meet and confer and prepare joint trial documents.

However, even "[w]hen evidence is improperly excluded, 'the error is not reversible unless "'it is reasonably probable a result more favorable to the appellant would have been reached absent the error.'"'" (*Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1538; see *Brown v. County of Los Angeles* (2012) 203 Cal.App.4th 1529, 1550; *Bell v. Mason* (2011) 194 Cal.App.4th 1102, 1107.) Winick does not explain why it is reasonably probable he would have achieved a more favorable result had the court allowed him to call other witnesses. He suggests he wanted to call "witnesses to testify regarding [Dick Clark Productions] officers and managing agents," but he does not explain who those officers and agents were, what they would have said, or how their testimony may have changed the outcome of the trial. Similarly, the only exhibits Winick complains he could not introduce were those evidencing his "lost income." But Winick's inability to prove lost income was not the reason he did not prevail at trial; he lost on the merits. Thus, Winick has not shown it is reasonably probable that, had he called other witnesses or introduced additional exhibits, the trial court would have found the defendants' conduct was not reasonable under the circumstances.

D.    *Any Error in Sustaining the Demurrer to Winick's Cause of Action for Violation of the Bane Act Was Harmless*

Finally, Winick argues the trial court erred in sustaining the demurrer to his cause action for violation of the Bane Act. Any error in the court's ruling, however, was harmless in light of the judgment.

Winick's cause of action for violation of the Bane Act was based on the same facts he alleged in support of his cause of action for false imprisonment. Winick alleged he had the "right to protection from bodily restraint and harm," which Noble LA violated through "coercive and intimidating tactics" when Winick "was not allowed to leave the Hotel despite not being under arrest by police, and instead held . . . for at least forty-five minutes." As discussed, however, the trial court ruled the security guards' use of reasonable force to temporarily detain Winick was proper. Thus, Winick would not have prevailed on his cause of action for violation of the Bane Act for the same reasons he did not prevail on his cause of action for false imprisonment. (See *Curtis v. Twentieth Century-Fox Film Corp.* (1956) 140 Cal.App.2d 461, 465 [order sustaining a demurrer to the plaintiff's second count did not prejudice the plaintiff where the count "add[ed] nothing to the first count," the "gist of both counts" was the same, and "[a]ll evidence which could have been introduced under the averments of the second count was introduced under the averments of the first count"]; *Arp v. Blake* (1923) 63 Cal.App. 362, 370-371 [order sustaining a demurrer did not prejudice the plaintiff where "the court tried the issues tendered by the same allegations" through a different cause of action and found against the plaintiff]; see also *Grell v. Laci Le*

30

*Beau Corp.* (1999) 73 Cal.App.4th 1300, 1307 [error in sustaining a demurrer was harmless where the defendant prevailed on summary judgment on a different ground].)

## DISPOSITION

The judgment is affirmed.  Respondents are to recover their costs on appeal.


SEGAL, J.


We concur:


PERLUSS, P. J.


FEUER, J.